IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

GILBERT AGUIRRE JR., *Petitioner*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent,*

CITY OF GOODYEAR, *Respondent Employer,*

COPPERPOINT AMERICAN INSURANCE COMPANY, *Respondent Carrier*.

No. 1 CA-IC 17-0017
FILED 12-4-2018

---

Special Action - Industrial Commission
ICA Claim No. 20152-040228
Carrier Claim No. 15A00579
Honorable Robert F. Retzer, Administrative Law Judge

**AWARD SET ASIDE**

---

COUNSEL

Taylor & Associates, PLLC, Phoenix
By Thomas C. Whitley, Nicholas C. Whitley
*Counsel for Petitioner*

Industrial Commission of Arizona, Phoenix
By Gaetano J. Testini
*Counsel for Respondent, ICA*

CopperPoint American Insurance Company, Phoenix
By Mark A. Kendall, Sharon M. Hensley
*Counsel for Respondents Employer and Carrier*

Toby Zimbalist, Phoenix
*Counsel for Professional Firefighters of Arizona, Amicus Curiae*

---

## OPINION

Presiding Judge Michael J. Brown delivered the opinion of the Court, in which Judge Jennifer B. Campbell and Judge Patricia A. Orozco[1] joined.

---

**B R O W N**, Judge:

**¶1** Gilbert Aguirre Jr. seeks review of an Industrial Commission of Arizona ("ICA") award concluding he failed to prove he sustained a work-related injury. He argues the administrative law judge ("ALJ") failed to comply with *Post v. Industrial Commission*, 160 Ariz. 4 (1989), which requires an ALJ to make findings that are specific enough to enable proper judicial review of the award. Because we cannot properly review the award on this record, we set aside the award.

## BACKGROUND

**¶2** Aguirre, a firefighter for the City of Goodyear ("Goodyear"), received a blood test for his annual employment physical in May 2015. His test results were abnormal and soon thereafter he was diagnosed with chronic myeloid leukemia ("CML"). Aguirre filed a workers' compensation claim, which was denied by the respondent carrier, CopperPoint American Insurance Company ("CopperPoint").[2] Aguirre timely requested an ICA hearing, and the ALJ held hearings where Aguirre and two physicians testified.

---

[1] The Honorable Patricia A. Orozco, retired Judge of the Arizona Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article VI, Section 3, of the Arizona Constitution.

[2] Unless otherwise noted, we refer to Goodyear and CopperPoint collectively as "CopperPoint."

¶3            Aguirre testified that in August 2000 he started working as a firefighter in Sierra Vista, and as part of his job duties he responded to both structural and wildland fires.  In August 2007, Goodyear hired Aguirre as a firefighter.

¶4            Following his CML diagnosis, Aguirre obtained his Goodyear firefighting records to help him recall the types of fires he responded to and his likely chemical exposures.  Of the fires identified, Aguirre was most concerned about a large fire in a cabinet factory that contained "paints, thinners, lacquers, [and] everything that they used to make cabinets," an airport hangar with burning jet fuel, a potato chip factory, a house with chlorine stored in the attic, and a number of meth labs.  For some fires, Aguirre wore a self-contained breathing apparatus ("SCBA"), but for others it was not standard practice, and afterwards—when he would not wear a SCBA—he would have soot on his hands and face, and up his nose.  When the firefighters returned to the station after a fire, they would use a garden hose and a brush to "try to get as much off of us that we could."  Then they cleaned up the equipment and showered.

¶5            Marc Wilkenfeld, M.D., board certified in occupational medicine, authored a report based on Aguirre's occupational history as a firefighter, and testified at the hearing.  When attempting to relate a disease to an exposure, the doctor explained that several elements were important: (1) the correct disease diagnosis, (2) workplace exposures and latency periods—the time between "exposures and the development of the disease," and (3) biologic responsibility, i.e., what the medical literature says about exposures in terms of carcinogenicity.  The doctor addressed these points in his report and testimony.

¶6            As background for his report, Wilkenfeld interviewed Aguirre and reviewed his work-related exposures to carcinogenic material and medical treatment records.  Wilkenfeld stated that Aguirre responded to four or five fires per month and had annual physical examinations clearing him for work as a firefighter.  As a firefighter, Aguirre "had repeated exposure to the carcinogens present at the fires, often without proper protective equipment."  Wilkenfeld concluded that based on his review of medical literature, exposure records, and Aguirre's medical history, Aguirre developed CML as a result of such exposures.

¶7            Wilkenfeld testified about Aguirre's exposure to chemicals and toxins that could lead to a diagnosis of CML, including benzene, asbestos, heavy metals, dioxins, and volatile organic compounds, to which he was exposed only during his work as a firefighter.  Wilkenfeld explained

that the fires Aguirre identified as being of particular concern were dangerous in terms of exposure to carcinogens because they involved oils and solvents. He also noted that even if Aguirre used protective gear, he still would have been exposed to toxins while cleaning his equipment at the fire station after firefighting in toxic environments.

¶8 Wilkenfeld has experience working with the World Trade Center program that has treated firefighters, responders, and survivors of the September 11, 2001 attacks ("9/11") since 2001. He stated that CML is on the list of cancers compiled by the federal government that are believed to have resulted from 9/11 exposures. He further testified that for firefighters present at Ground Zero who developed CML, the federal government has accepted latency periods as short as two years. Wilkenfeld relied on peer-reviewed studies that have shown increased rates of leukemia in firefighters. For these reasons, Wilkenfeld opined that "to a reasonable degree of medical certainty," Aguirre developed CML "as a result of exposure that he experienced during his work as a firefighter."

¶9 Jason Salganick, M.D., board certified in medical oncology, produced a report and testified on behalf of CopperPoint. He reviewed Aguirre's testimony, medical treatment records, and the Goodyear call records, as well as Wilkenfeld's report and testimony. Salganick also performed a literature search on PubMed and reviewed monographs by the International Association for Research on Cancer ("IARC") and what he termed documents "involving 9/11 research and government directive protocols for compensation of firefighters."

¶10 In his report, Salganick noted that the toxins to which firefighters are generally exposed include "benzenes, polycyclic aromatic hydrocarbons, aromatic amines, [and] chlorinated dioxins." He acknowledged that benzene is a potential carcinogen and is included in IARC's list of chemicals to which firefighters are presumed to be exposed. Salganick testified that firefighters are generally exposed to potential carcinogens, including benzene, but he could not determine if Aguirre was exposed to a known carcinogen as defined by the IARC because the records did not indicate what specific toxins were present at particular fires, what protective gear Aguirre wore, or the length of time he spent at each fire.

¶11 Salganick also explained he was not aware of a reasonable relationship between any carcinogen to which Aguirre may have been exposed and CML, yet he acknowledged that Aguirre "would have been exposed" to various "well-documented substances," including benzene. Salganick stated he was unable to find that Aguirre's cancer was "causally

related to his work as a firefighter." Salganick also explained why his opinion differed from Wilkenfeld's opinion when they had both relied on the same studies. Salganick stated that based on his review of the medical literature, it was necessary to show a standard mortality ratio ("SMR") of greater than 200, or a two-fold increase in the risk of developing cancer, before a study could be considered statistically significant and the cancer reasonably related for purposes of establishing a compensable claim. According to Salganick, there is a paucity of medical literature meeting that standard. As a result, the literature only supported a *possible* connection between Aguirre's work as a firefighter and CML. Regarding the federal government's 9/11 Ground Zero list of potentially-related cancers, the only two on the list that have been recognized as being causally related are thyroid and prostate cancer.

¶12 Following the hearings, the parties filed simultaneous post-hearing memoranda. In his ruling, after briefly summarizing the testimony, the ALJ stated he was more persuaded by CopperPoint's memorandum and concluded that Aguirre "failed to carry his burden of proving by a reasonable preponderance of the evidence that he sustained a work related injury on May 14, 2015." Following Aguirre's request for review, the ALJ summarily affirmed the award and Aguirre sought review in this court.

## DISCUSSION

¶13 To establish a compensable injury under the Arizona Workers' Compensation Act, a claimant must prove an accidental injury that arose out of, and in the course of, employment. *See* Ariz. Rev. Stat. ("A.R.S.") section 23-1021; *Malinski v. Indus. Comm'n*, 103 Ariz. 213, 216 (1968) (stating that claimant has the burden to affirmatively establish entitlement to compensation). An injury includes an occupational disease, A.R.S. § 23-901(13)(c), which is compensable only if the claimant meets six requirements, including proof of a "direct causal connection between the conditions under which the work is performed and the occupational disease," A.R.S. § 23-901.01(A). The compensability of certain occupational diseases contracted by firefighters or peace officers, however, involves a lower burden of proof, as reflected in A.R.S. § 23-901.01(B):

> [A]ny disease, infirmity, or impairment of a firefighter's or peace officer's health that is caused by . . . leukemia . . . and that results in disability or death is presumed to be an occupational disease as defined in § 23-901, paragraph 13, subdivision (c) and is deemed to arise out of employment. The presumption is granted if all of the following apply:

1. The firefighter or peace officer passed a physical examination before employment and the examination did not indicate evidence of cancer.

2. The firefighter or peace officer was assigned to hazardous duty for at least five years.

3. The firefighter or peace officer was exposed to a known carcinogen as defined by the international agency for research on cancer and informed the department of this exposure, and *the carcinogen is reasonably related to the cancer.*

(Emphasis added.)[3] On appeal, CopperPoint does not dispute that subsections B(1) and B(2) have been satisfied; instead, it focuses primarily on subsection B(3)'s third prong—the requirement that the carcinogen to which Aguirre was allegedly exposed is "reasonably related" to his CML. To meet that condition, Aguirre had to "demonstrate that *at least one* carcinogen he was exposed to during hazardous duty is reasonably related" to his CML. *Hahn v. Indus. Comm'n*, 227 Ariz. 72, 75, ¶ 12 (App. 2011) (emphasis added).

**¶14**        Aguirre argues the ALJ's award lacks legally sufficient findings for this court to be able to review whether the award was compensable, citing *Post*. In *Post*, our supreme court granted review to "examine the need for and degree of specificity in findings and awards required in workers' compensation cases." 160 Ariz. at 5. The *Post* court first noted the lack of specificity in the award at issue there—the ALJ "made no factual findings of consequence, resolved no conflicts in the evidence, and set forth no conclusions applying law to fact. Instead, . . . he simply set forth the ultimate legal conclusion." *Id.* Concluding that "judicial review" was not possible "on this record," the court re-affirmed the longstanding principle that an award must specify the basis for the ultimate disposition

---

[3]        The legislature's 2017 amendment to § 23-901.01(B) included a provision addressing the standard of proof required to rebut the presumption. *See* A.R.S. § 23-901.01(F) ("The presumptions provided in subsection B of this section may be rebutted by a preponderance of the evidence that there is a specific cause of the cancer other than an occupational exposure to a carcinogen as defined by the international agency for research on cancer."). Because we only address whether the award includes sufficient findings, the 2017 amendment does not affect the substance of our analysis.

and the evidence supporting that basis. *Id.* at 7–8; *see also Douglas Auto & Equip. v. Indus. Comm'n*, 202 Ariz. 345, 347, ¶ 9 (2002) (stating that an ALJ "must make factual findings that are sufficiently comprehensive and explicit for a reviewing court to glean the basis for the [ALJ's] conclusions"); *Wammack v. Indus. Comm'n*, 83 Ariz. 321, 325 (1958) (stating that "the findings of administrative agencies must be explicit to enable the reviewing court to review the decision intelligently and to ascertain whether the facts as found afford a reasonable basis for the decision or be sufficiently definite and certain to permit of judicial interpretation").

## A.     Waiver

**¶15**         CopperPoint contends that Aguirre is precluded from seeking appellate review of the sufficiency of the ALJ's findings because he failed to raise the issue in his request for review of the award by the ALJ. We are not persuaded by this contention for several reasons. First, nothing in *Post* suggests a party is required to challenge the sufficiency of findings in a request for review as a condition of asserting that argument on appeal. *See* 160 Ariz. at 7 (requiring ALJs to include sufficient findings to ensure that judicial review is possible).

**¶16**         Second, although a party seeking to challenge an ICA award in the appellate courts must first file a request for review, A.R.S. § 23-943(A), that same provision makes it clear that a party has no obligation to include any specific arguments in the request to preserve them for appellate review, *id.* (stating that a request for review "*need only state that the party requests a review of the award*" and that the request "*may* be accompanied by a memorandum of points and authorities") (emphasis added). *See generally Backus v. State*, 220 Ariz. 101, 104, ¶ 11 (2009) ("When statutory language admits of only one interpretation, we go no further.").

**¶17**         Third, CopperPoint's reliance on *Stephens v. Industrial Commission*, 114 Ariz. 92 (App. 1977), is misplaced. *Stephens* did not address the question presented here—whether the failure to raise a challenge to the sufficiency of findings must be raised in a request for review. Instead, the issue in *Stephens* centered on the claimant's argument that the hearing officer erred by addressing whether a permanent disability had been proven. *Id.* at 94, 95. Explaining that the claimant had previously challenged the carrier's notice terminating benefits with no permanent disability, we rejected his argument on three grounds: (1) the claimant clearly placed the matter at issue in his request for hearing; (2) given the lack of evidence presented regarding a permanent disability, the claimant necessarily failed to meet his burden; and (3) he failed to raise the issue at

any point in the ICA proceedings. *Id.* at 96. Addressing the third ground, we explained that consistent with principles of exhaustion of administrative remedies, our review would "be limited to the same matters which the hearing officer could consider in its review of its own decision." *Id.* at 95.

¶18 Here, Aguirre had no obligation to challenge the sufficiency of the findings in the ICA proceedings to preserve it for appeal because the only action he was required to take under § 23-943 was to file a request for review; he was not required to raise any specific argument. Thus, unlike the issue in *Stephens*, the exhaustion of administrative remedies doctrine does not apply here because § 23-943 is permissive as to whether a party may challenge the sufficiency of the ALJ's findings in a request for review. *See Sw. Paint & Varnish Co. v. Ariz. Dep't of Envtl. Quality*, 194 Ariz. 22, 24, ¶ 14 (1999) (recognizing that "the exhaustion of administrative remedies doctrine does not apply in many circumstances, including those where the remedy is permissive").

¶19 Because *Stephens* does not apply to the issue before us, neither does the sole reported decision that relied on *Stephens* in summarily concluding that failure to challenge the sufficiency of the ALJ's findings in a request for review waives that argument on appeal. *See Spielman v. Indus. Comm'n*, 163 Ariz. 493, 496 (App. 1989). *Spielman* was decided 11 months after *Post*, but did not address it. And the only reported decision citing *Spielman* is *Teller v. Industrial Commission*, 179 Ariz. 367, 371 (App. 1994), which relied solely on *Spielman* to conclude that failure to raise lack of findings in a request for review precludes that party from raising the issue on appeal. *Teller* has never been cited in a reported decision for the principle that a party in an ICA proceeding is precluded from challenging the sufficiency of the ALJ's findings if it failed to raise that argument in a request for review. Because the genesis of these two cases was *Stephens*, a case that did not address the question presented here, we decline to follow *Spielman* and *Teller* insofar as they would preclude us from deciding whether the award in this instance includes sufficient findings.

¶20 Accordingly, we hold that *Post*'s requirement that an ALJ make findings sufficient to permit meaningful judicial review, 160 Ariz. at 8, applies even if a party fails to raise that specific issue in a request for review. We are not suggesting a party should ignore an obvious issue of insufficient findings; the better practice would be to bring the matter to the ALJ's attention. But failure to do so does not preclude judicial review.

## B.    Sufficiency of Findings

**¶21**        Alternatively, CopperPoint argues the ALJ's award "contains ample findings and conclusions" to permit meaningful appellate review. Relying on *Pearce Development v. Industrial Commission*, 147 Ariz. 582 (1985), CopperPoint notes that a court will uphold an award where the ALJ "at least draws conclusions on the legal issues" and thereby allows the court to "determine from the record" whether the evidence supports the ALJ's conclusions.  In *Post*, our supreme court distinguished *Pearce*, because the ALJ in *Pearce* "had at least drawn conclusions on the legal issues so that we could determine from the record whether the evidence supported his conclusions."  160 Ariz. at 8.  The *Post* court acknowledged that normally, an appellate court reviews the record in search of support for the award. *Id.*   However, in *Post*, the court was "unable to perform the type of judicial review that workers' compensation cases require."  *Id.*

**¶22**        Here, the lack of specificity in this award mandates the same conclusion.  The ALJ summarized the facts and the testimony of both doctors and came to the bare conclusion that Aguirre "failed to carry his burden of proving by a reasonable preponderance of the evidence that he sustained a work related injury."  The ALJ did not resolve conflicting evidence, make ultimate factual findings, provide legal analysis of § 23-901.01(B)(3), or discuss *Hahn*, which is the only reported decision to date interpreting that statute.  *See Post*, 160 Ariz. at 8 ("If we were to approve the award here, however, with no stated resolution of conflicting testimony, no findings of ultimate fact, and no conclusions on the legal issues, there would be no purpose in requiring [ALJs] to make findings.").

**¶23**        Finally, with no citation to authority, CopperPoint also argues the ALJ's reliance on its post-hearing memorandum makes the findings sufficient.  Our research reveals one reported decision where this court found, under unique circumstances, that an ALJ's reliance on a party's legal memorandum was sufficient to comply with *Post*.  *See Hester v. Indus. Comm'n*, 178 Ariz. 587, 589–90 (App. 1993) (noting the ALJ's findings "incorporated" one party's memorandum and the court "could determine whether the factual assumptions and legal arguments in this memorandum support the no loss award").  *Post* recognized that an ALJ's findings do not have to be in "any particular form" but the supreme court reiterated that "we must know how the [ALJ] reached his or her conclusion."  160 Ariz. at 8–9.  Stated differently, regardless of the format in which the findings are presented, if the award requires us to speculate about how the ALJ resolved material disputes in the case, then the findings are insufficient.  *See id.* at 7–9 ("Although lack of findings on a particular issue does not invalidate an

award per se," if we must "speculate" about the basis for the award or "assume a factfinder role," then the award must be set aside.).

¶24 Here, the ALJ's decision finding that CopperPoint's memorandum was more persuasive does not satisfy *Post*. We need not address every point in the eight-page memorandum to reach this determination, as a few examples will suffice. CopperPoint asserted that Aguirre failed to meet the statutory presumption, but even if he did, the ALJ "should conclude that Dr. Salganick's opinions are more probably correct that there is insufficient scientific evidence to support a causal connection between [Aguirre's] CML and his work as a firefighter." But CopperPoint cited no authority addressing under what circumstances an employer may rebut the presumption under the statute, as worded in 2015. *See Hahn*, 277 Ariz. at 77, ¶ 18 n.3 (declining to address the "nature and effect" of the presumption "when it does apply").

¶25 CopperPoint argued Aguirre failed to establish, under the first prong of § 23-901.01(B)(3), he was exposed to a known carcinogen as defined by the IARC, relying on Salganick's testimony. Wilkenfeld stated in his report that Aguirre "had repeated exposures to the carcinogens present at the fires," including "Polycyclic Aromatic Hydrocarbons (PAHs) and dioxins." Wilkenfeld testified that as a firefighter Aguirre would have been exposed to "things like benzene." Salganick testified that nothing in the records showed that Aguirre was exposed to a known carcinogen, but on cross-examination he agreed Aguirre "would have been exposed" to substances such as "benzenes, [etc.]" because "they are generally accepted as the kinds of chemicals to which firefighters are exposed." And Salganick did not dispute that benzene is listed by the IARC. CopperPoint's memorandum, however, did not include any discussion of benzene or the other potential carcinogens the doctors discussed in their reports and testimony.

¶26 CopperPoint's memorandum also seemed to suggest that Aguirre failed to report his exposure to his employer as required by the second prong of § 23-901.01(B)(3). The statute does not address when, or in what format, such a report must be given. *See* § 23-901.01(B)(3). Regardless, other than the award's bare reference to the memorandum, nothing else in the record indicates the ALJ relied on either of these prongs to conclude that Aguirre failed to meet his burden.

¶27 CopperPoint argued further that Aguirre "presented absolutely no evidence that he was exposed at a particular time to a particular carcinogen." Aguirre challenged this point in his request for

review, asserting that CopperPoint was seeking to impose "an impossible burden" by contending that he was required to connect exposure to a specific potential carcinogen to a specific firefighting event. Without citation to authority, CopperPoint faulted Wilkenfeld for failing to identify details such as the year of the exposure, the length of time Aguirre was on the scene, whether Aguirre went into the fire or manned a hose or what type of protective equipment he used during the alleged exposure. Nothing in the statute or *Hahn* requires this level of detail. As we explained in *Hahn*, application of the statute means Aguirre "need only show a *general* causal link between a carcinogen to which he was exposed and one of the enumerated cancers to qualify for the presumption, *not that the exposure caused his particular cancer*." 277 Ariz. at 76, ¶ 16 (second emphasis added).

¶28        Finally, as to the credibility of witnesses, the memorandum fails to satisfy *Post*'s directive that an ALJ "must resolve all conflicts in the evidence, especially when the conflicts involve expert medical testimony." 160 Ariz. at 8. Although CopperPoint analyzed portions of the testimony, the memorandum lacks any meaningful attempt to resolve the various conflicts between the opinions offered by Wilkenfeld and Salganick. For example, the experts offered conflicting testimony as to what the SMR, or increase of risk in developing cancer, must be to show a reasonable relation between exposure of a carcinogen and the cancer. According to Salganick, anything less than a two-fold increase in the risk means that a connection between a carcinogen and the cancer is only possible, not probable, but Wilkenfeld disputed that a two-fold increase is required to establish a probable association. They also offered differing opinions as to what types of carcinogens Aguirre was exposed to, if any, and disagreed as to whether Salganick was qualified to offer an expert opinion on causation.

¶29        Nothing in the ALJ's award or the memorandum indicate that the ALJ resolved these issues. It is not our role to speculate as to which arguments made by CopperPoint the ALJ found more persuasive to ultimately conclude that Aguirre failed to meet his burden. Thus, referencing the memorandum does not remedy the ALJ's inadequate findings. In our view, an ALJ will generally be better served to issue his or her own findings instead of relying on a party's memorandum. Doing so will help avoid ambiguities and conflicts that may arise on appeal. Thus, at a minimum, an ALJ choosing to rely on a memorandum should carefully delineate which portions of the memorandum he or she is relying on and how those portions support the award.

¶30        On this record, we must set aside the award because the lack of findings leaves us unable to meaningfully review the ALJ's decision. *See*

*id.* at 7 ("[W]e have no way of evaluating the basis of the judge's award and consequently cannot determine the factual support for, or the legal propriety of, his conclusion."). Aguirre needed to show a general causal link between his exposure to at least one particular carcinogen and his CML, but we are unable to determine whether the ALJ erred by ruling he failed to meet that burden—we cannot tell what evidence the ALJ relied on and why, or what elements of § 23-901.01(B), if any, were not satisfied.

## CONCLUSION

¶31      Given the absence of legally-sufficient findings, we set aside the ICA award.



AMY M. WOOD • Clerk of the Court
FILED:  AA